FARLEY, Appellant,

v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS, Appellee.

[Cite as *Farley v. Ohio Dept. of Rehab. & Corr.* (1997), 118 Ohio App.3d 576.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 96API07–836.

Decided March 11, 1997.

*Stukey & Associates* and *Linda S. Stukey,* for appellant.

*Betty D. Montgomery,* Attorney General, and *J. David Goodman,* Assistant Attorney General, for appellee.

BOWMAN, Judge.

Plaintiff-appellant, Otis Farley, was an inmate at the Orient Correctional Institution and was working as a plumber's helper in January 1991. While working to unplug a drain at the food service building, appellant stepped on a cover plate for the pot wash, the side of the cover plate flipped up and appellant's right leg fell into the pit. The pot wash was set into a pit in the floor and had large racks used to hold pots and pans for washing. The water was usually kept between one hundred eighty and one hundred ninety degrees. Appellant testified that the water temperature was not well regulated due to a faulty regulator and, on occasion, the water reached the boiling point.

Appellant testified that his leg wedged between some pipes inside the pit and another inmate and appellant's supervisor, William Ryan, helped pull appellant out. After pulling up his pants leg, they attempted to remove his sock and shoe. In doing so, appellant's skin also pulled off with the pants and the sock. Appellant described his leg as looking like "hamburger or meat." The supervisor and inmate took appellant to Frazier Health Center on a motorized cart, which is not generally used to transport prisoners.

At the health center, appellant was examined by a nurse who gave him a shot of Demerol and an ice pack. He was taken back to his cell. He could not walk on his own, nor get into or out of his assigned top bunk. Appellee refused to

assign him to a lower bunk. With assistance, he returned to the health center later in the day. He was given Tylenol and told to change the dressing on his leg once a day and report to pill call three times a day. As appellant was unable to report to pill call, other inmates took his identification and returned with Tylenol for him. Appellant further testified:

"Q. Now, we have only gotten through the first day of the injury, what did you do for that night?

"A. Cried. I mean period. That's it. Laid up in that bed and cried. I mean—."

The next day he received crutches but he was unable to maneuver them. For three days he could not get in or out of bed alone and he experienced incontinence during that time. It was approximately three weeks before he could walk the distance to go to meals and had to rely on other inmates to bring food to him.

On January 11, 1991, appellant's mother visited the warden. After the visit, he was again taken to the health center and was examined by a doctor for the first time. He was never taken to the hospital. The doctor prescribed Tylenol 3 for four days. Several areas of his leg became infected, necrotic and began to smell. Several areas were bleeding and oozing fluids, and the bandages had to be soaked off for removal because they were stuck to his leg. Every day for several days, the nurse debrided his leg, a process of removing the dead skin with a rough sponge. Appellant testified that the debriding process hurt almost as much as the accident itself and told one of his cell mates that the debriding felt like he was "being skinned." Appellant testified that, for the first five days after the accident, the pain was "too much."

Twelve days after the accident, his ankle was still too swollen to wear a shoe. The nurse told him that his ankle could not be treated for the sprain because of the burn. Eventually, he purchased larger shoes and was able to wear them.

On February 1, 1991, he was told to return to work. He was unable to complete many tasks at work for approximately thirty more days, and it was approximately sixty to seventy days before he could perform all his tasks. Appellant suffered first, second and, in his opinion, third degree burns and an ankle sprain. He still has pain, swelling, permanent discoloration and limited movement and activities. He has a permanent scar that looks like a sock burn, which resulted from the elastic forming vertical ridges down his leg as well as a circular burn around the ankle.

Appellant filed an action seeking compensation for past, present and future damages; past, present and future pain and suffering; past, present and future loss of mobility; loss of future income; and quality of life. Appellee admitted liability for the accident on July 12, 1995. A trial on damages was held, appellee

presented no evidence, and the Court of Claims found that appellant had suffered a severe burn and a sprained ankle. The court stated:

"Plaintiff proved by a preponderance of the evidence that he had a permanent slight discoloration in the area of his right ankle for which the court will grant a judgment to plaintiff in the amount of $3,000 for permanent discoloration of his right ankle plus $2,000 for pain and suffering plus medical expenses of $286."

Appellant appeals and raises the following assignments of error:

"Error 1: The trial court erred in denying Plaintiff damages for permanent ankle injury.

"Error 2: The trial court erred in considering diagnoses of arthritis in the medical records.

"Error 3: The trial court erred in awarding only $2,000.00 for pain and suffering."

■ By the first assignment of error, appellant contends that the Court of Claims erred in denying him damages for permanent ankle injury. The Court of Claims stated that there were no complaints in appellant's personal daily diary of ankle pain after February 4, 1991, thereby implying that appellant had no ankle complaints after that date. The Court of Claims also found that any complaints appellant may have are due to arthritis, stating that this finding was based upon the fact that, on September 5, 1990, appellant gave his medical history at Lorain Correctional Institution and indicated that he had arthritis and took medication for arthritis. The Court of Claims also stated that appellant's expert assumed that the history and facts given him by appellant were true but the Court of Claims found that appellant's testimony was not very credible.

■ The standard of review for appellate courts has been set forth in *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. Judgments which are supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. In this case, the Court of Claims' decision is not supported by competent, credible evidence.

Appellee cites various reasons that appellant's testimony was not credible, including that one who is in excruciating pain would not have the presence of mind to write in a journal. Appellant testified that he wrote in four or five journals to record his daily activities during his imprisonment because there was little else to do. Appellant did not start keeping a journal just to record events relating to the accident. Also, the Court of Claims found that, since appellant stopped writing in his journal, the pain must have also ended. Although appellant discontinued writing about his ankle complaints in his diary, it does not

necessarily follow that his ankle pain ended at that time. Appellant's medical records from Orient contain complaints of ankle pain on June 18, 1991, August 29, 1991, September 25, 1991, and December 12, 1991. Appellant sought treatment from Dr. Casselberry on February 6, 1995, after his release from Orient in November 1994, and the doctor testified that appellant had told him the pain from this injury was severe. The doctor had treated other patients with similar burns and those patients had experienced excruciating pain and required a high level of narcotics until the tissue was able to heal.

The trial court also stated that the X-ray taken of appellant's ankle the day after the accident indicated that no fractures occurred. The fact that appellant did not fracture his ankle in the accident does not preclude a permanent injury.

Appellant provided the testimony of one of his cell mates, who testified that appellant complained of ankle pain at least three months after the injury. Both his cell mate and his wife testified that appellant was restricted in his physical activities after the injury, such as playing with his grandchildren, and participating in sports such as basketball and walking, whereas he had been very active before the injury.

Appellant's expert, Dr. Casselberry, testified that appellant has a proximal tibial scar from the burn and weakness of the muscles that cross the ankle joint. He also testified that appellant has a twenty-four- or twenty-five-percent impairment of the ankle which translates into a permanent impairment of seven percent of his whole person, that his pain and limp are likely to increase, and that the injuries are related to the accident. This testimony was consistent with, and supported, appellant's testimony concerning his injury and resulting impairment.

Appellee contends that appellant's expert testified that the seven-percent debilitation is minimal; however, the expert found a twenty-four- or twenty-five-percent impairment of the ankle, which then translates into a permanent impairment of seven percent of his whole person. Although it may be minimal, as regards the whole person, the expert testified that the impairment exists and nothing else in appellant's medical history indicates a different cause.

As to the unreliability of Casselberry's testimony, appellee argues that the expert changed his opinion when confronted with the possibility that appellant had arthritis. Actually, the expert testified that his opinion would not change. The transcript provides:

"Q. Knowing what you know now as far as the fact that Mr. Farley has a history of arthritis, would you—is it possible that you could come up with a different result than you have previously?

"A. Knowing what I know now, probably not.

"Q. Why is that?

"A. Well, because he didn't have a complaint regarding his ankle prior in the record, that I'm aware of, and he supposedly had this injury and may have developed some residual from the injury."

Appellee contends that appellant's testimony was not credible because he put moisturizer on his leg to enhance the look of the burn in an effort to make the scar from the burn look more serious. Appellant's expert testified that the moisturizer was necessary because of the permanent injury to the skin. Appellant suffers from itching, burning and sensitive skin and has no hair or sweat glands in the burned area. Therefore, the moisturizer is necessary to lubricate the burned area, and is not done to enhance the scar.

Appellee also contends that appellant does not have a permanent limp from the injury. Appellant's expert testified that, if one had a permanent limp, one's leg muscles would develop in different ways and there was no difference in the size or shape of appellant's leg muscles. However, appellant did not assert that he had a permanent, in the sense of a constant, continuous limp but, rather, that he limps sometimes, which may depend upon the shoes he is wearing, the weather, or the activity in which he was engaged. Even though intermittent, a limp may still be permanent.

The Court of Claims misinterpreted much of the evidence that was provided by appellant and as appellee provided no contrary evidence, the Court of Claims' decision is not supported by competent, credible evidence. Appellant's first assignment of error is well taken.

By the second assignment of error, appellant contends that the Court of Claims erred in considering a diagnoses of arthritis in the medical records. Appellant contends that the records that diagnose appellant with arthritis are hearsay and should have been excluded as such.

Regardless of whether the records are admissible, they do not demonstrate that appellant's ankle pain is due to arthritis. Appellant's medical records demonstrate that, on September 5, 1990, appellant had no history of arthritis. On October 10, 1990, appellant complained of arthritic pain in his elbows, shoulders, knees and neck. He was taking Naprosyn as of October 15, 1990, and, on October 23, 1990, he completed a medical history form indicating that he was taking medication for arthritis. However, nowhere in the written records is there an indication of arthritis in appellant's right ankle.

The reports from the X-rays taken the day after the accident of his right ankle indicate that old fractures had healed, no new fractures were visible and there was degenerative joint disease developing; however, these findings were repudiated by appellant's expert and the X-rays taken on November 2, 1995. Appellant's expert testified that the November 2, 1995 X-rays indicate that there was

no prior healed fracture and there was no indication of any bone deterioration. The X-ray report indicated that there was no bone or joint abnormality involving appellant's ankle; therefore, his ankle was not broken during the accident. When questioned about arthritis, appellant's expert testified that his opinion as to appellant's injuries would not change even if he knew appellant complained of arthritis and took Naprosyn previously because appellant did not complain about pain in his ankle prior to the injury. Appellant's expert found no arthritic condition in appellant's left leg, and the degenerative condition would generally affect both legs. The expert believed that the January 11, 1991 X-ray report may have been misread, as the November 2, 1995 X-rays repudiated the findings of the earlier X-ray report.

Regardless of whether the medical reports were hearsay, they did not demonstrate that appellant's pain was due to a degenerative disease in his right ankle and the Court of Claims erred in relying upon them as evidence of such. Appellant's second assignment of error is well taken in that the Court of Claims erred in relying upon diagnoses of arthritis in the medical records.

■■ By the third assignment of error, appellant contends that the Court of Claims erred in awarding only $2,000 for pain and suffering. The general rule is that an appellate court cannot reverse the judgment below if that judgment is supported by competent, credible evidence. See *C.E. Morris Co.* "However, if the judgment is against the manifest weight of the evidence and is so grossly inadequate that it shocks the conscience and constitutes an abuse of discretion, this court cannot allow the judgment to remain undisturbed." *O'Neil v. State* (1984), 13 Ohio App.3d 320, 321, 13 OBR 398, 399, 469 N.E.2d 1010, 1013, citing *Spicer v. Armco Steel Corp.* (App. 1974), 68 O.O.2d 314, 322 N.E.2d 279.

In this case, appellant's expert testified that he observed a proximal tibial scar from the burn, weakness of the ankle muscles and necrosis, which is irreparable. The doctor observed damage to the hair follicles on appellant's leg and these conditions correspond to appellant's complaints of itching, burning, increased sensitivity of the skin and a lack of sweat. The expert testified that appellant has a twenty-four- or twenty-five-percent impairment of the ankle. The doctor also testified that appellant's pain and limp are likely to worsen in the future.

The doctor's testimony lends credible support to appellant's testimony concerning the injury and pain. Although the trial court found appellant's testimony not credible, we are unable to find any basis for this conclusion in the record and conclude that the trial court's decision is against the manifest weight of the evidence. The evidence supports a finding that appellant has a permanent injury and has experienced "excruciating" pain and will continue to suffer pain with time. Therefore, the trial court erred in awarding only $2,000 for pain and suffering because the amount is so grossly inadequate that it shocks the con-

science and constitutes an abuse of discretion. Appellant's third assignment of error is well taken.

For the foregoing reasons, appellant's assignments of error are sustained, the judgment as to a finding for appellant is affirmed, but the judgment is reversed as to the amount of damages and this matter is remanded to the Court of Claims for a redetermination of damages.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

TYACK, P.J., and LAZARUS, J., concur.